[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of proceedings:
Nearly three years after first taking custody of Jasmine H., the Commissioner of the Department of Children and Families (DCF), on March 6, 1996, instituted this proceeding by which she seeks termination of the parental rights of Nicole R. and James H., mother and acknowledged father of this child, born on May 28, 1989, removed to foster care on July 6, 1993 and committed to DCF on September 22, 1993. Both parents, duly served, appeared at the initial hearing on April 3, 1996 and, through their separate court-appointed counsel, entered pleas denying the allegations and contesting the proposed relief at a hearing on May 8, 1996 at which the mother did not attend, reporting, through counsel, that she had to attend a funeral out of state.
Three months after filing this petition, DCF moved for a court ordered clinical evaluation. Because neither parent CT Page 9835 appeared at separately scheduled appointments in September, a scheduled trial date of November 1, 1996 was continued until January 9 and 10, 1997. Before the rescheduled trial date, Dr. Swenson, the court appointed psychologist, saw both parents individually, but after discussing the potential impact on the child with her therapist, Dr. Swenson recommended that no interaction session between Jasmine and her mother be required. Such an interaction session between Jasmine and her father was scheduled but cancelled at the father's request because of a purported job interview and ultimately never held because he never called back; to reschedule.
Two weeks before the rescheduled trial date, on Christmas Eve of 1996, a motion by the mother's attorney was filed seeking another continuance because of staff changes and illness in the firm representing her. On April 3, 1997, more than one year after filing the instant petition, trial began. At the end of the first trial day, a continuance date of April 11 was agreed to, but on that date a further continuance was necessitated by the mother's having to attend another funeral out of state. May 2, 1997 at 10 a.m. was agreed to by the parties and counsel. On that date, trial was delayed half the morning because the father had failed to secure necessary transportation. Since that delay necessitated a third trial day, all parties and counsel agreed to a date certain two weeks later at 10 a.m. On May 16, however, neither parent arrived by 10 a.m. At 10:20 a.m. James called his attorney to say he had gone to another court hearing (for child support) in another venue fifteen miles away, but had arranged for a ride. At 10:40 a.m. he called his attorney again to say his ride had arrived. By 11:30 a.m., when neither parent had appeared, the hearing was terminated and the parties given until June 13, 1997 for the submission of trial memoranda on evidence offered to that date. Two weeks later counsel for James filed a motion to reopen the evidentiary phase of the trial to permit him to testify, suggesting that a traffic problem between Bridgeport and Norwalk might have delayed his appearance on May 16. A hearing was set for June 12 in New Haven for the purpose of hearing argument on his motion and, if granted, to hear his testimony. Although he had assured his attorney a day before the hearing that he had transportation to the place set for this hearing, he neither appeared nor called his attorney or the court clerk. His motion to reopen the hearing was therefore denied by default. Nicole did not appear at either of the last two hearings and submitted no motion for reopening the proceedings for any reason. CT Page 9836
The trial is thus deemed to have concluded on June 12, 1997 with the period for submission of trial memoranda extended to July 8, 1997, the day on which the period of reserved decision is deemed to have begun.
Facts:
Evidence offered in two days of trial, interpreted in the light of the prior history of this child in this court, supports the finding of the following facts.
Jasmine was the first of four children, none of whom share a common paternity, born to Nicole between 1989 and 1993. (Petitioner's Exh. T, p. 10). At the time this petition was filed, the only child in her custody was a son fathered by Jerry N. with whom she and Jasmine were living in February of 1993 when Nicole requested James to care for the child while she entered a drug treatment program out of state. James has fathered two other children by different mothers, neither of whom were living with him at, or since, that time.
Although not yet four when placed with her father and his then girlfriend, Jasmine was able to report to the latter that she had been sexually molested by her mother and her boyfriend, Jerry N., while living with them. Subsequent professional evaluations have confirmed that sexual molestation by Jerry (Testimony of Elizabeth Ann Byrne, MSW, the child's therapist since August of 1993), with a resultant diagnosis of Post Traumatic Stress Syndrome (PTSS). (Testimony of Dr. Swenson, Ph.D., court-appointed clinical evaluator.) Because she was then in the custody of her father, who had responded appropriately (securing a physical examination, involving the child in counselling) no action was taken by DCF at that time. Soon after James and Jasmine moved into a home occupied by his mother, his two sisters and their three children, all four of the little cousins, ranging in age from two to six, were placed in temporary DCF custody after having been found in that home with no adult supervision. When James could not be located at his reported place of employment, DCF secured an Order of Temporary Custody (OTC) in connection with filing neglect petitions. James was provided with counsel and did not contest an adjudication of neglect and commitment to DCF effective September 22, 1995. In a post-commitment hearing on November 17, 1993, upon being apprized by DCF that James had been irregular in visitation, the court CT Page 9837 required him to visit every Thursday afternoon at 4 p.m. at the DCF office as a condition precedent to resuming Jasmine's custody.
Nicole returned from a church-based California drug treatment program in November of 1993. She was told that visitation with Jasmine could only resume upon the recommendation of the child's therapist but in the meantime she should involve herself in drug counseling, Narcotics Anonymous and parenting classes. The social worker also suggested that she obtain an attorney. (Petitioner's Exh. C, p. 1; testimony of Sheryl Paul). At that time, the permanency plan was reunification with James, with which Nicole agreed. (Petitioner's Exh. I.) Later, in 1995, when it appeared that the father's interest and ability to resume care of the child was questionable, a plan to place Jasmine with her paternal grandmother was being considered (Petitioner's Exh. K), with which both parents apparently agreed. lt was not until the treatment lan of February of 1996 (Petitioner's Exh. N), two and one-half years after Jasmine's initial placement in foster care, that DCF changed its permanency plan to termination of parental rights and adoption, based upon the failure of both parents to adhere to any of the required preconditions for reunification and the withdrawal of the paternal grandmother from consideration as a permanent placement for the child. Neither parent appeared at the administrative review of that treatment plan, and at the time DCF had no addresses to which to mail the written plan reflecting the imminency of the termination proceeding.
Nicole requested visitation with Jasmine soon after returning from California in November of 1993. She was told that the child's therapist advised against any contact at that time because of the severity of the child's symptoms and the origin of her trauma. In the summer of 1994 DCF suggested that she contact the child's therapist to ascertain what must be done before visitation could resume without resultant harm to the child. The therapist did not recommend joint counseling with the mother, but suggest that the mother seek her own therapist who could be obtained from the same agency. Nicole did nothing to further this suggestion. Although told not to permit contact between mother and child during visits to him, James permitted Nicole to come to a visit at the paternal grandmother's home in February of 1994 [Note: Nicole testified that this unplanned encounter took place in February of 1995.]. The child's response to seeing her mother (which family members told her to lie about) was a "severe regression", an "extreme recurrence of symptoms" CT Page 9838 such as lying, enuresis, misbehavior in school, which lasted two to three months. (Testimony of Byrne.)
Nicole admitted to DCF social workers that Jasmine had witnessed Jerry beating, as well as having sex with, her, and while denying all sexual abuse of Jasmine by herself, admitted that she had used belt in punishing the child, and that she had left the child alone with Jerry on a number of occasions. As preliminary steps to reinstating contact with her daughter, Nicole was asked to involve herself in a local drug treatment program to confirm her self-professed sobriety. She apparently did so, but discontinued after producing two urine samples positive for marijuana, a substance which she does not regard as being counter indicated for parents. Testifying on her own behalf on May 2, 1997, she claimed Jasmine was happy to see her in February of 1995, notwithstanding the testimony of the child's therapist. She acknowledged that she had started using marijuana at age 13 and crack cocaine at age 19 when with James H, with whom she began to use drugs more consistently. She had been told by a relative of Jerry N.'s sexual abuse of Jasmine before leaving for California but did not inform James or take any other action in response to this information. She gave birth to a son, the child of Jerry N. a month before her return to Connecticut. She denied using drugs since leaving for the treatment program in California and was unable to explain the positive tests for THC in 1995: "It must have got there some other way." She recalled leaving for California when Jasmine was three; the record shows that Jasmine turned four a month before she went to California. She claimed to have called James regularly while in California between June and November of 1993, but denied being told that Jasmine had been removed from his custody in July of 1993. She testified that she did believe that Jasmine was molested by Jerry and admitted heavy use of crack cocaine at the time she gave Jasmine's custody to James. She admitted that Jerry had called the fathers of her two younger daughters in 1992 to come and retrieve their children (which they did), but claimed it was not because of her drug use at the time but rather happened when Jerry could not locate her when she was actually "right downstairs" or, alternatively, "at the store". Because Nicole failed to appear at the two subsequently scheduled hearings (May 16 and June 12, 1997), this testimony was not subjected to cross-examination.
Although James did not appear to testify in his own behalf, the record shows that he had acted appropriately when he learned CT Page 9839 of Jasmine's sexual abuse, and that when DCF took her custody, the plan for more than a year was to return her to his care provided that he obtain adequate housing, secure a stable source of income, identify appropriate child care, produce a "clean-slate" drug assessment, and — while working on these objectives — visit the child weekly as specified by the judge in November of 1993. The carefully documented record of father-daughter contacts (Petitioner's Exh. D) shows a gradually diminishing manifestation of interest, concern and responsibility: Because of his failure to show up for an office visit, he was asked in November of 1993 to telephone DCF to confirm so that the child would not be brought to the DCF office expecting to see her father and be disappointed, an event that caused a highly negative response in the child, according to her therapist. One such visit took place the day after the court hearing in which weekly visitation was explicitly stated by the judge to be the condition precedent to return of her custody but only one other visit took place between November 18, 1993 and January 20, 1994. In the next five months, out of a potential 21 visits that could have taken place, James requested and appeared for only seven. After a visit on July 8, 1994, the location and time of the visit was changed to accommodate the father. After nine weekly visits, James failed to appear on September 7. After five more weekly visits, when he failed to appear for a scheduled visit on October 25 he was asked to call the social worker by 3 p.m. of the day of the visit to minimize Jasmine's disappointment if he failed to appear. After that, he only called on time once — November 29, 1994. From that time to t, he time of filing this petition, James did not choose to exercise his right to weekly visitation. Instead, since DCF had begun regular visits with the paternal grandmother as potential alternative permanent caretaker, James began to drop in at her home during some of these visits. At the end of November, 1995, after visits with the grandmother stopped when she ceased all contact with Jasmine's CHOICE social worker (Jasmine having been placed in a specialized CHOICE foster home on April 7, 1994), James did not call to request reinstitution of his own visitation rights. After receiving notification that DCF would be filing for termination of parental rights, James did call and stated that ". . . he would quit his job and get his life together, and would call her next day". (Id, unnumbered fifth page.) He did not call, and since he had moved without informing the social worker of his new address, he could not be invited by mail to the treatment plan review in February of 1996. CT Page 9840
After the instant petition was filed in March of 1996, and James had appeared in initial hearings in April and May of that year, he called DCF in August to announce that he had moved to Pennsylvania and to ask for his attorney's telephone number. The following month he did not appear for the hearing on Extension of Commitment or for the court-ordered psychological evaluation scheduled for September. He canceled the interaction session with Dr. Swenson in November and failed to call her, as invited, to schedule another. And, as noted above, he elected to attend a child support hearing in Bridgeport instead of returning to Norwalk to testify in his own behalf on May 15, 1997, and failed to ask his attorney to intervene on his behalf in continuing the support matter. When the court provided a hearing on his motion to reopen to permit him to testify, he failed to come to court or to contact his attorney.
Adjudication — on facts as of March 6, 1996
Since the petitioner has not amended her original pleadings since the date of the original filing, the adjudicatory date remains March 6, 1996. (Conn. Practice Book Sec. 1042.1, subsection (4).)
Father:
By the adjudicatory date, the father had failed to exercise his right to weekly visitation for over a year, having seen his daughter just seven times, during visits with paternal grandmother in the latter's home, in the twelve months preceding the adjudicatory date. Had he so requested, he could have seen his daughter 52 times in this same period. Although asked to do so, he had never obtained a drug assessment to determine if the drug use disclosed by Nicole had abated. While he missed appointments and rescheduled visits to accommodate his work schedules, he never actually secured employment for any significant period of time. His residence has changed a number of times and DCF has not always known where he could be located. From being the most likely family member to regain Jasmine's custody, he has drifted out of her life, leaving a saddened and disappointed little girl on those occasions when he scheduled visits and failed to appear. His conduct throughout the period of Jasmine's commitment to DCF, just as his level of participation in these proceedings, reflects Dr. Swenson's evaluation of James as a man who wants to be a good father but is unable to follow through. His lack of common sense and ability CT Page 9841 to learn from experience disables him from solving problems. Passive, anxious, indecisive, he demonstrated to Dr. Swenson a low level of interest in parenting and in ability to understand the full extent of Jasmine's psychological problems.
 He appears to experience inner conflicts regarding responsibility vs. his own pleasure or his need for avoidance . . . he has no major psychopathology but has difficulty assuming responsibility and tends to avoid environmental or interpersonal demands. (Petitioner's Exh. B., p. 12.)
The foregoing provides clear and convincing proof of two of the four nonconsensual grounds pleaded for terminating James's parental rights:
1. James has abandoned his daughter, not in the common-law sense of a total and intentional relinquishment of all contact, but rather in the statutory definition found in Section 17a-612 (c) applicable to children, such as Jasmine, who were previously committed to DCF, of a failure to evidence a reasonable degreeof interest, concern or responsibility. The abandoning father's state of mind is not determinative; it is his conduct, as manifested toward his child that is. In Re: Michael M.29 Conn. App. 112 (1993).
2. James has failed to rehabilitate in the sense that between July 6, 1993, when his daughter was initially placed by DCF and March 6, 1996, the adjudicatory date for this termination proceeding, he has ". . . failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child he could assume a responsible position in the life of the child" [emphasis added]. When Jasmine was committed, James was living with relatives whose childcare practices were questionable, resulting in the placement and commitment of his daughter. Two years and eight months later, James continues to change residences, frequently returning to the home of the same relatives. He has participated in no recommended programs to improve his understanding of the child or his responsibility toward her. He has verbalized responsible intentions to both the social worker and the clinical psychologist, but has followed through with none of them. He was no closer on the adjudicatory date to being able to understand and meet the special needs of his severely traumatized daughter as he was on the date she was placed in foster care. CT Page 9842 This is consistent with the well-meaning but passive way that he confronts all responsibility, according to Dr. Swenson. Considering Jasmine's age, the length of time she has already spent in foster care, her extraordinary degree of neediness and need for highly specialized parenting to deal with her PTSS symptoms, there is no basis to believe that within a reasonable time James could assume the responsibility of parenting this child.
The other two grounds pleaded by the petitioner for terminating James's parental rights are dismissed for failure of the requisite degree of proof: (1) Petitioner offered no evidence that Jasmine has been denied any care, guidance or control by acts of omission or commission by James, other than those circumstances which lead to her placement in July of 1993. The state could not, and does not, argue that those same circumstances should do double duty three years later to terminate his parental rights. (2) Jasmine has clear and affectionate memories of her father according to Dr. Swenson. The fact that she is sad when he fails to come to scheduled visits establishes that she does have positive memories of and feelings for her father, which, under appellate interpretation of this ground, is sufficient to preclude its being found in this case.
Mother:
Nicole was living out of state when Jasmine was committed. Circumstances arising while in her father's custody led to her placement and commitment. Although, the court in 1993 was made aware of the child's allegations of sexual molestation while in her mother's home that had been made after being placed with her father, they were not the basis for the adjudication of neglect at that time. While they might have been the basis for a disposition that excluded replacement with the mother in fact she did not participate in those proceedings or offer her home as a possible placement at that time. When her mother made herself known to DCF after commitment, and sought renewed contact with her daughter, this was denied, not capriciously but after consultation with a qualified therapist who had been seeing this traumatized child for many months. None of the suggestions that were made to Nicole to prepare herself for the possible institution of visitation in the future were followed. The unrefuted testimony of two qualified clinical experts was unequivocal in recommending against any resumption of relationship with her mother in whose care Jasmine had been CT Page 9843 sexually abused by her mother's boyfriend, exposed to sexual behavior between her mother and the boyfriend, and inappropriately punished by her mother. The only indication that Jasmine ever made to her therapist that she might want to see her mother was for the purpose of asking her why she had permitted Jasmine to be mistreated in that way. The only contact between mother and daughter since the former's return to the area in November of 1993 produced sever regressive behavior in the child, who will continue to need specialized caretaking, as well as therapy, for an indefinite period in the future.
Such record supports three of the four grounds pleaded for terminating Nicole/s parental rights:
(1) Failure to rehabilitate — At the time Jasmine was committed, Nicole's whereabouts were unknown. On the adjudicatory date, her whereabouts were known, and, according to her uncorroborated testimony, she had stayed off hard drugs, completed her education, secured employment and was taking care of her youngest child, fathered by the same Jerry N. who sexually molested Jasmine and would be likely to assert visitation rights to his child so long as placed with Nicole. The mother offered no evidence to support her asserted freedom from drug abuse, and apparently regarded marijuana, for which she had tested positive in 1995, as a different matter. She has not engaged in any kind of therapy recommended to help her understand the damage done to Jasmine by the abuse suffered in her home prior to her placement with James. Nor did she display any understanding of the severity and extent of that damage. While she may have rehabilitated in some ways (if her testimony may be accepted at face value), to parent another, less needy, child, that rehabilitation is far from sufficient to rebut the state's prima facie case that she has ". . . failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of this child,
[she] . . . could assume a responsible position in the life of the child." Her failure to appear at the last court hearing, like her failure to keep the initial appointment with Dr. Swenson, suggests that her life has not yet achieved that degree of stability and understanding of Jasmine's needs that are essential for anyone who assumes primary responsibility for her well-being.
2. Lack of parent-child relationship. While positive memories of, or feelings for, a remembered noncustodial parent may be sufficient to preclude use of this ground for terminating CT Page 9844 the parental rights of that parent under the interpretation given in In Re Valerie D. 223 Conn. 492 (1992); In Re Kelly S.29 Conn. App. 600 (1992), when all memories of, or feelings for, a noncustodial parent are negative or destructive, this ground is still available. It is a feeling for a parent that would preclude this ground as a basis for termination. Unrebutted testimony by both Dr. Swenson and Ms Byrne establishes that Jasmine's recollection of her mother is wholly negative, that she only wants to see her for the purpose of asking why she let those things happen to her when they lived together. That sort of recollection is no barrier to concluding that whatever relationship may exist between Jasmine and her mother, it lacked any positive attribute that would make it, under any definition, a parent-child relationship. In Dr. Swenson's words, "She has troubled memories of her mom."
(3) Acts of commission or omission. While it was known that the child alleged sexual molestation while in her mother's home shortly after being placed with her father in early 1993, this was not a fact alleged for the adjudication of neglect. From the relative safety of foster care, since July of 1993, the full extent of the abuse suffered while in her mother's care has been exposed. Like a shadow cast by an unseen object which provides a basis for judging the relative size of that object, a child's diagnosis of PTSS, based upon behaviors reflecting the trauma of sexual molestation, permits the conclusion that whatever happened to Jasmine in her mother's home, it was sufficiently traumatic to cause the many severe symptoms described by Ms Byrne in her testimony. While there were no adult witnesses to what happened to Jasmine in her mother's home — there never are when the victim is a very young child — the expert witnesses agreed that it had been sufficiently traumatic so that Jasmine, even four years after placement, should not be asked to have contact with, much less return to the care of, the mother in whose earlier care such behavior was inflicted this constitutes, if not acts of commission, acts of omission by Nicole prior to Jasmine's placement with James in February of 1993, sufficient to fit within this statutory definition:
The petitioner cannot prevail on the asserted ground of abandonment in this case, where the mother had been requesting visitation from the time of her return to the jurisdiction, two months after commitment. Even where, as here, such visitation is denied for valid clinical reasons, the mother cannot be charged with the failure to demonstrate a reasonable degree of interest, CT Page 9845 concern or responsibility. She asked. She was denied. She asked again. Again she was denied. Under these circumstances DCF is estopped from asserting abandonment as a basis for terminating the mother's parental rights This ground is therefore dismissed.
2. Disposition — on facts as of May 15, 1997
In the fifteen months that elapsed between the adjudicatory date and the last date on which testimony was given, nothing basically had changed. The father moved out of state, but apparently has returned to the jurisdiction. He has not requested resumption of regular visitation. Neither parent has indicated a present ability to provide this child with adequate care to meet her extraordinary emotional needs. Neither has engaged in counseling of any kind. Neither has documented a self-professed freedom from drug abuse. Nicole has not sought return of custody of her other two daughters, both younger than Jasmine, residing with their respective fathers. In fact, so long as the DCF plan was return to father or to paternal grandmother, Nicole was content not to pursue resumption of custody herself. In her clinical interview with Dr. Swenson, Nicole minimized seriousness of a PTSS diagnosis or the severity of the symptoms manifested by the child. The fact that neither parent appeared at the last hearing or offered excuses, believable or otherwise, for not doing so suggests that their pattern of the past few years is essentially unchanged.
The only clinical evidence in this record strongly supports termination of parental rights and the assurance of permanency with the present foster parents. In Dr. Swenson's opinion, the uncertainty of where "home" is has lasted far too long already for a child who has suffered the degree of psychological damage that Jasmine evidences. She needs the assurance of stability, of "long-term belonging", in Dr. Swenson's phrase. Dr. Swenson saw only detriment in the continuation of visitation, even with the father with his erratic record of repeatedly disappointing the child, and saw only a benefit to Jasmine from the complete cessation of all visitation.
It is therefore found by clear and convincing evidence that termination of the parental rights of both parents is in Jasmine's best interests, and it is further found by the same degree of evidence, that DCF made reasonable efforts to reunite the child first with her father, then with her father's mother. No effort could be made to reunite her with her mother so long as CT Page 9846 the child's therapist felt that the child had been so traumatized in her care that any contact was contraindicated therapeutically. Advising the mother to seek private counseling and to produce documentation of her freedom of substance abuse — neither of which Nicole did — was all that DCF reasonably could do under these circumstances.
Mandatory findings;
Even though grounds have been found to terminate the rights of both parents, and the only clinical evidence in this record strongly recommends termination, such rights cannot be terminated until the court makes findings, pursuant to subsection (e) of Sec. 17a. 112, as amended by P.A. 96-246, on the following seven considerations:
1. DCF offered appropriate services to both parents by recommending counseling, drug treatment, and, in the case of the father, facilitating visitation. No evidence was offered by either parent that such services were unavailable or that any impediment existed to their utilization. Lack of indication that any of these recommendations were being followed for a period of three years warranted the conclusion, made judicially in the second extension hearing on September 9, 1996, that further efforts to reunify the child with either parent were no longer appropriate.
2. DCF made reasonable efforts to reunite Jasmine with her family for far longer than the twelve months required under the federal Adoption Assistance and Child Welfare Act of 1980, as amended. When it appeared, after more than a year, that the father was evidencing less ability and motivation to parent this child than he had at the time of her commitment, DCF turned its attention to the paternal grandmother. The permanency plan for the second year was placement with her. The mother agreed to both of these plans. Only after the grandmother withdrew herself from consideration as permanent caretaker for Jasmine did DCF initiate proceeding to have the unrelated foster parents, who for two years had demonstrated the appropriate ability to provide for her special needs, become her permanent caretakers.
3. No court orders were entered into except for the parents to cooperate with the court-ordered clinical evaluations with Dr. Swenson and to come to court at designated times. Neither parent complied fully with either order, both parents failing to appear CT Page 9847 at the first scheduled clinical evaluation and at the last two court hearings. While not orders, the court's expectation that the father would visit weekly on Thursdays at 4 p.m., articulated by the judge in the presence of the father and his attorney on November 17, 1993, was only partially fulfilled during the first ensuing year and wholly departed from in 1995 and thereafter. The mother never appeared in court before the first hearing on the termination petition, so orders and expectations for reunification could not be specified for her prior to initiation of this action.
4. The child's feelings and emotional ties with both parents were well documented by her therapist of the past nearly four years, Ms Byrne. Jasmine resents the abuse she suffered in her mother's home and wants to see her mother only in order to learn why she permitted her boyfriend to abuse her. She looked forward to visits from her father, but was repeatedly disappointed when he failed to keep scheduled visits, ultimately showing no surprise when he failed to appear. In stark contrast is her close connection with her present foster parents whom she regards as her family and in whose home she feels secure.
5. Jasmine turned eight years old shortly after the trial concluded. She has been in foster care since she was a little over four years old and was last in her mother's care when she was still three. As she approaches latency age, her greatest psychological need is for the feeling of permanency with her present caretakers who have demonstrated their ability to meet her special needs with empathy and understanding for three years, and who are committed to raising her to adulthood.
6. James made no apparent efforts to adjust his circumstances, conduct or conditions to make it in Jasmine's best interests to return to his care in the foreseeable future. He followed none of the recommendations for counseling and treatment made repeatedly by DCF. He is no more stable or secure in his employment or residence that he was when Jasmine was initially removed from his care. Nicole has made a number of efforts to improve her circumstances (sobriety; education; employment) but these do not address Jasmine's greatest need which is for her caretaker to acknowledge the full extent of the trauma she has suffered, and to respond appropriately to her resulting special emotional needs. Nicole has done nothing to improve her capacity to provide these to her daughter. CT Page 9848
7. Nothing prevented James from maintaining a meaningful relationship with his daughter except his own characteristics of lack of motivation, passivity and disinclination to assume responsibility. Nicole was prevented from initiating contact with her daughter on the recommendation of the therapist who had had the child in treatment for PTSS for four years, and who had dealt with the "severe regression" that followed from the child's only contact with her mother more than a year before this action began. Under these conditions, the bar on Nicole's visitation with Jasmine can not be regarded as unreasonable.
Judgment
 Having considered the foregoing, and having found by clear and convincing proof that
1. DCF made reasonable efforts, under existing circumstances, to reunite this child with her Parents, and
2. One or more statutory ground has existed for more than one year for terminating the parental rights of each parent, and
3. Termination of her parents' rights is necessary to secure the best interests of Jasmine H., It is hereby ordered that the parental rights of Nicole R. and James H. in and to their child Jasmine H. be, and hereby are, TERMINATED. And it is further ordered that the Commissioner of DCF be appointed statutory parent for the purpose of securing permanent placement for this child as soon as possible, and to secure this end such Commissioner is ordered to submit to this court a written report as to the progress toward permanency 90 days after the date of this judgment, and every six months thereafter. :If adoption of the child has not been finalized by September 1, 1998, the said Commissioner is ordered file a Motion To Review Plan for Terminated Child to be heard in this court no later than fifteen months from the date of this judgment.
It is further ordered, suo moto, that commitment of this child shall be continued nisi until expiration of the appeal period or, if an appeal is taken, until final decision has been rendered thereon, but in no event beyond September 22, 1998. If an appeal is taken and is still pending on June 22, 1998 the Commissioner is ordered to file a petition to extend commitment on that date which must be heard no later than September 22, 1998 unless such appeal is denied in the interim. The Commissioner was CT Page 9849 required to file such a petition on June 22, 1997 under the provisions of Sec. 46b-129. Failure to do so in this case is not deemed to be an act of contempt only because it was not unreasonable to assume, when the last extension was granted in a court hearing on September 22, 1996, that final judgment would have been rendered in a termination petition filed in March of 1996 long before June of the following year. The many continuances which delayed trial from concluding until fifteen months after the initiation of this action were not due to any acts or omissions of the petitioner, and therefore no penalty will be considered. While termination has been ordered by this judgement, it will not be deemed final until the appeal period has elapsed, or, if an appeal is taken, until final judgment thereon. DCF will therefore be required to file petitions for extension of commitment pursuant to the requirements of Sec.46b-129, until all possibility of questioning the finality of this termination judgment has been eliminated.
Entered at Bridgeport this 8th day of August, 1997.
Frederica S. Brenneman, Judge